UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA          :
                                  :
  -against-                       :
                                  :          <u>MEMORANDUM OF LAW</u>
CHRISTOPHER GUNN,                 :
                                  :                22-CR-314
      Defendant.             :
--------------------------------------------------------X


**Memorandum of Law In Support of
Motion to Dismiss**



Allegra Glashausser
  Attorney for Mr. Christopher Gunn
Federal Defenders of New York
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Factual Background.................................................................................................... 3

Far from being threatening, the 5-minute video clip referenced in the complaint is slow-moving and full of lengthy pauses…………………………………………..3

Directly after the charged clip, Mr. Gunn discusses protesting, making it clear that his repeated phrase, "you don't got the stomach for **this**," refers to having the stomach to protest…………………………………………………………. ...5

Mr. Gunn next advises that people who can't protest should call the U.S. Attorney's Office to voice their complaints………………………………………5

Mr. Gunn discusses how to get "signatures for a petition."………………………7

Argument

Point I

The charges should be dismissed because Mr. Gunn's speech was protected by the First Amendment ..................................................................................................... 8

    A.    Only speech "likely" to produce "imminent" lawless action is "incitement," unprotected by the First Amendment .............................................................. 10

    B.    Only "true treats" are threats outside the protections of the First Amendment ................................................................................................................... 11

Point II

The case should also be dismissed because the charged conduct does not meet the statutory elements as it fails to allege that Mr. Gunn had the required mental state and saying that "we're going to storm" people is not a "threat to injure" ........................ 16

Conclusion.................................................................................................................... 21

# Table of Authorities

*Ashcroft v. Free Speech Coalition,*
   535 U.S. 234 (2002)................................................................8, 9

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969)................................................................9, 10

*Connick v. Myers,*
   461 U.S. 138 (1983)................................................................8, 11

*Elonis v. United States,*
   575 U.S. 723 (2015)................................................................12, 16

*Fogel v. Collins,*
   531 F.3d 824 (9th Cir. 2008)....................................................13

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982)................................................................10, 11

*New York Times v. Sullivan,*
   376 U.S. 254 (1964)................................................................11

*New York v. Operation Rescue,*
   273 F.3d 184 (2d Cir. 2001).....................................................13

*Planned Parenthood v. ACLA,*
   290 F.3d 1058 (9th Cir. 2002)..................................................13

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)................................................................11

*Snyder v. Phelps,*
   562 U.S. 443 (2011)................................................................9

*United States v. Alkhabaz,*
   104 F.3d 1492 (6th Cir. 1997)..................................................20

*United States v. Berndt,*
   127 F.3d 251 (2d Cir. 1997).....................................................18

*United States v. Choudhry,*
    649 F. App'x 60 (2d Cir. 2016) .......................................................................18

*United States v. Feeney,*
    2022 WL 580955 (E.D.N.Y. Feb. 25, 2022) ....................................................18

*United States v. Francis,*
    164 F.3d 120 (2d Cir. 1999) ......................................................................12, 19

*United States v. Howell,*
    719 F.2d 1258 (5th Cir. 1983) .......................................................................12

*United States v. Jordan,*
    639 F. App'x 768 (2d Cir. 2016) ....................................................................18

*United States v. Jordan,*
    2017 WL 9516819 (W.D.N.Y. July 14, 2017) ................................................19

*United States v. Kelner,*
    534 F.2d 1020 (2d Cir. 1976) ....................................................................11, 13

*United States v. Li,*
    537 F. Supp. 2d 431 (N.D.N.Y. 2008) ...........................................................19

*United States v. Mara,*
    2021 WL 8200597 (W.D.N.Y. Apr. 19, 2021) ...............................................19

*United States v. McCain,*
    2023 WL 2335332 (2d Cir. Mar. 3, 2023) ................................................16, 17

*United States v. Morales,*
    272 F.3d 284 (5th Cir. 2001) .........................................................................13

*United States v. Mundle,*
    2016 WL 1071035 (S.D.N.Y. Mar. 17, 2016) ................................................19

*United States v. Rundo,*
    990 F.3d 709 (9th Cir. 2021) .........................................................................10

*United States v. Smith,*
    2023 WL 1126789 (2d Cir. Jan. 31, 2023) ....................................................17

*United States v. Sovie*,
    122 F.3d 122 (2d Cir. 1997) .........................................................................11, 19

*United States v. Spear*,
    2021 WL 794784 (D. Vt. Mar. 2, 2021) ...............................................................19

*United States v. Stock*,
    728 F.3d 287 (3d Cir. 2013) .................................................................................20

*United States v. Telfair*,
    2020 WL 550646 (E.D.N.Y. Feb. 3, 2020) ...........................................................19

*United States v. Turner*,
    720 F.3d 411 (2d Cir. 2013) ............................................................................12, 15

*United States v. Vaughan*,
    2022 WL 4361108 (2d Cir. Sept. 21, 2022) .........................................................18

*United States v. Veliz*,
    2004 WL 964005 (S.D.N.Y. May 5, 2004) ...........................................................19

*United States v. Waldman*,
    2018 WL 2932729 (S.D.N.Y. June 12, 2018) .......................................................19

*United States v. Wallace*,
    2022 WL 3141759 (N.D.N.Y. May 31, 2022) ......................................................18

*United States v. White*,
    670 F.3d 498 (4th Cir. 2012) ................................................................................12

*Virginia v. Black*,
    538 U.S. 343 (2003) .......................................................................8, 9, 10, 12

*Watts v. United States*,
    394 U.S. 705 (1969) .........................................................................8, 9, 20

**Introduction**[1]

Christopher Gunn is a 40-year-old father who lives in Illinois with his partner and their two young children, ages 9 and 6. In 2021, he was part of a community of people who disagreed with the handling of the R. Kelly prosecution. To make their voices heard, they demonstrated at protests in New York and Chicago, and posted videos on-line presenting their opinions about the R. Kelly case. Mr. Gunn became focused on why the prosecutors were not investigating the parents of the minor children victimized by R. Kelly, reasoning that, if R. Kelly was guilty, the parents had been complicit in the abuse. He posted hours of content about the R. Kelly cases. These videos include times of intense, animated dialogues with other members of the community and Mr. Gunn's thoughts on news clips about the R. Kelly case, as well as long pauses and full-length R. Kelly R&B ballads.

Mr. Gunn's federal prosecution, however, relates to an approximately 5-minute clip of a YouTube video posted in October 2021, in which he said he would "storm" the offices of the three E.D.N.Y. prosecutors in R. Kelly's case. This comment was

---

[1] For purposes of this motion, all facts as stated in the indictment and complainant are deemed to be true, and are viewed in the light most favorable to the prosecution. Thus, for purposes of this motion, and without waiving the right to put the government to its proof in the event this motion is denied, the communications are referred to as being made by Mr. Gun in October 2021.

not a true threat and it was not an incitement to violence. Instead, it was protected First Amendment speech.

Moreover, the original clip was actually taken from a much longer, full-day long YouTube posting. The full video, in particular the approximately 30-minutes after the originally-charged clip, provides crucial context for the shorter clip, making it abundantly clear that – however inartful Mr. Gunn's comments about the three R. Kelly prosecutors were – his intent was to get his viewers excited about protesting the R. Kelly case by picketing in front of the prosecutors' offices, calling their offices to voice complaints and ask questions, and gathering signatures for a petition – not to incite anyone to violence or threaten anyone with physical harm.

In context, Mr. Gunn's comments about the E.D.N.Y. prosecutors related to protesting the R. Kelly trial and the tactics taken by the U.S. Attorney's Office. In context, his comments were not threats but protected First Amendment speech. In context, he did not have any intent to threaten the prosecutors. Also, Mr. Gunn's actions support that the video was not a true threat: he was not arrested for nine months after the video was posted. In that time, he took no action indicating he was carrying out a threat. When he was arrested, his house was searched; no guns were found. In an interrogation right after his arrest, he was genuinely confused that

officials thought he had threatened them.[2] He did nothing to try to physically "storm" any offices in New York, which were about 800 miles away from his home.

Because Mr. Gunn's speech was protected by the First Amendment, this Court should dismiss the indictment against him. Alternatively, this Court should dismiss the indictment because the facts fail to meet the elements of Section 875(c) as a matter of law.

**Factual Background**

<u>Far from being threatening, the 5-minute video clip referenced in the complaint is slow-moving and full of lengthy pauses.</u>

Watching the 5-minute clip that underlies the charges, it is difficult to imagine it scaring someone. Mr. Gunn's words are not accompanied by video; it is simply audio and pictures, with long pauses of silence. To be blunt: watching this clip is a bit boring. Before the charged clip, an R. Kelly slow-jam plays. Shortly afterward, Mr. Gunn said:

> "I want you all to get real familiar with this building I'm about to pull up and show to you. This is where we're going to be going." 6:47.[3] [*Pause*]. "Hold on." 6:52. [*Pause*].

> "I want to show you all…Uhhhh…I'm going to show you all exactly where we're going to be going. We're going to get real

---

[2] Mr. Gunn has been extremely consistent in explaining that he had been protesting the R. Kelly trial, saying in his interrogation, I would "pull up a building where we would protest." Interrogation around minute 48. He elaborated that he believed that the E.D.N.Y. prosecutors should have charged the parents of the R. Kelly victims with crimes as well. Interrogation around 1:37 ("I remember saying where the building was located and people need to call and ask why they aren't locking up the parents if they are taking advantage of little kids.").

[3] Any errors in quotations here are unintentional; time stamps are approximate.

familiar with this building and the enterprise, otherwise known as the KSteppas. I don't really care if people steal my ideas at this point. Uhhh." 7:19.

"We know who is going to, uh, stick to everything that I told you, with his if Kells goes down, everybody going down…where is this…." 7:41 [*15+ second Pause*].

"Uugh." 8:00. "Okay here we go." [*Pause*].

"Okay, hold on, here we go." 8:15. [*Pause*].

"Why would the judge in New York permit that girl to be in court with that liar liar. Why would the judge permit that girl to be a witness [ ] surviving R. Kelly." 8:32.

He then posted a picture of the Eastern District U.S. Attorney's

Office; the picture is the top result in a google search for the Eastern District

U.S. Attorney's Office. He continued: "You see this building right here ?"

8:47 [*Pause*].

"That building is located right outside of the courthouse where R. Kelly was being prosecuted at. The first building on the corner. That is the United. States. Federal prosecutor office. That's where they at. That's where they work at." 9:13. [*Pause*]

"That's where they work at. We're going to storm they office. We're gonna storm they office. We're going to storm, uh, Nadia Shihata, Ms. Geddes, uh, and Ms. Cruz. We're going to storm their office. You get what I'm saying? You all ain't got the stomach for this shit? This would be a good time now to bail out. You don't want to take this ride, then bail out. You understand what is about to go on." 10:07. [*Pause*].

"Now if you ain't go the stomach for this shit we're about to do, I'm asking you to bail out." 10:38.

Mr. Gunn then played a clip from Boyz in the Hood[4], in which four people are in a car, one driving, another who has a gun, a third who has a pacifier in his mouth, and a fourth person who asks to be "let out." The car stops, one person is let out, and the clip ends with him walking on the street. This section of the video available at https://tinyurl.com/2p873d9a.

> Directly after the charged clip, Mr. Gunn discusses protesting, making it clear that his repeated phrase, "you don't got the stomach for **this**," refers to having the stomach to protest.

After the Boyz in the Hood clip, Mr. Gunn repeats: "if you ain't got the stomach for what's about to go down, bail the fuck out," adding, "nobody's forcing you. A lot of our **protests** in the future will be held right outside of the United States Attorney's Eastern District of New York's office." He repeats, "If you don't got the stomach for this bail out. Everybody that can't make it to the protests in the future, I would like you to call this number." 12:39. Given this context, it is clear that the "this," in the phrase "you don't got the stomach for this," is a reference to protesting at the U.S. Attorney's Office. Clip of this section of the video available at, https://tinyurl.com/2tty96hu.

> Mr. Gunn next advises that people who can't protest should call the U.S. Attorney's Office to voice their complaints.

As Mr. Gunn continues speaking, his goal of protesting how the prosecutors

---

[4] Boyz in the Hood was a popular and critically acclaimed movie from Mr. Gunn's youth, which earned Oscar nominations for best director and best original screenplay and three NAACP Image Award nominations.

are handling the R. Kelly case, and specifically their decision not to prosecute the parents of the witnesses, becomes even clearer. He says that anyone who can't come to the protest could instead call the U.S. Attorney's Office. He posts the main number for the office, which is publicly available, and appears in the highlighted result from a google search for the Eastern District of New York U.S. Attorney's Office, (718) 254-7000. He advises that people should call and "inform them that you read transcripts or watched the trial of R. Kelly and [that parents] also encouraged their daughter and gave consent to their daughter's relationship with a grown man…" Clip of this section of the video available at, https://tinyurl.com/ypyuuy8y. He continues, "Start[ ] by calling this number right here asking to speak to, let me see, let me make sure I get all of these names right, make sure I get this right," 14:06, [*pause*] "let me get this right." Clip of this section of the video available at, https://tinyurl.com/tdxy6y3d. He continues, "we're going to be asking to speak to Elizabeth Geddes (there is just one of them) we will also be asking to speak to Nadia Shihata. Let me drop these names in the chat." 14:45 (*pause*). "See that name right there, Elizabeth Geddes. Call the office and ask to speak to Elizabeth Geddes and ask her if the Acting United States District Attorney Of New York why did she not bring charges against these parents if these allegations against these parents, if these allegations are true." 15:10. Clip of this section of the video available at, https://tinyurl.com/4z9ac6fk.

6

<u>Mr. Gunn discusses how to get "signatures for a petition."</u>

After discussing protesting in person and calling to voice disagreement, Mr. Gunn then suggested "getting signatures for a petition." 22:39. He states, "That petition should be at a thousand. All of our [ ] collectively, hit a thousand at a minimum. I only see 500 people sign that petition. We need more people to sign that petition. Okay?", "We need at least 5000-10,000 signatures. I don't give a damn. Look, In the future, at our protests, we'll have that, uh, petition in real life, real form. ….we'll ask people that's walking past to sign that petition. We're going to do real leg work, real leg work." 23:30. Clip of this section of the video available at, https://tinyurl.com/3r264ep4.

These themes of protesting in-person, on the phone, and in writing are repeated throughout the video. *See, e.g,* 32:44 ("We're going to stand out in front of Elizabeth Geddes office and demand that charges be brought against anyone who claims to be an underage victim of Robert Sylvester Kelly"); 33: 18 ("And anywhere there will be protests we'll be asking for signatures and continue to ask people to sign the petition. You got this stomach for this shit?"); 45:50 ("Call 718 254 7000 and ask Elizabeth Geddes if we are to believe RSK charges where are the parents? It's real simple.").

Given these themes, the full video shows that Mr. Gunn had no intent to threaten the prosecutors.

## Argument

## The charges should be dismissed because Mr. Gunn's speech was protected by the First Amendment.

The First Amendment prohibits the Government from "abridging the freedom of speech." U.S. Const. amend. I. The "hallmark of the protection of free speech is to allow free trade in ideas" – even ideas that many people don't like or agree with. *See Virginia v. Black*, 538 U.S. 343, 358 (2003). "[I]mposing criminal penalties on protected speech" is the starkest example "of speech suppression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). Thus, a statute that "makes criminal a form of pure speech[ ] must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969).

Mr. Gunn's video shows him engaging in a lengthy exchange of ideas. He offers his opinions on a high-profile trial of a public figure; viewers comment on his thoughts; he comments on videos posted by other people and by news outlets. While his ideas – that the parents of the minor children who testified against R. Kelly should be prosecuted – are surely outside of the mainstream and others may find them "distasteful or discomforting," *Black*, 538 U.S. at 358, they are protected by the First Amendment.

This is especially true as the R. Kelly prosecution, and how it was being conducted, was unquestionably a matter of "public concern," about which the First Amendment protects an especially robust exchange of ideas. *See Connick v. Myers*, 461

8

U.S. 138, 145 (1983) ("[T]he [Supreme] Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."). The trial was highly publicized, discussed regularly in the news, and by the general public. Matters of public concern are "at the heart of the First Amendment's protections," and reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011); *see also id.* at 443 ("Although the boundaries of what constitutes speech on matters of public concern are not well defined, [the Supreme] Court has said that speech is of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of general interest and of value and concern to the public.") (cleaned up).

Of course, "[t]he protections afforded by the First Amendment [ ] are not absolute." *Black*, 538 U.S. at 358. "The freedom of speech has its limits; it does not embrace certain categories of speech, including [ ] incitement," *Ashcroft*, 535 U.S. at 246, and "true threats." *Watts*, 394 U.S. at 708. But speech can only be limited for incitement if it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). And it can only be limited for true threats if the comments "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359.

9

Mr. Gunn's remarks were neither incitement nor true threats. Mr. Gunn's remarks were unlikely to produce imminent lawless action, and did not produce any lawless action. On the contrary, the government apparently did not become aware of the charged video clip until nine months after it was posted. Mr. Gunn also did not state he would injure anyone or communicate a "serious expression of an intent to commit an act of unlawful violence." *Id.* On the contrary, he stated – at the worst – a vague expression that he would "storm" the prosecutors' office and then elaborated that he would do so by protesting at the office, calling the office, and having people sign petitions. These remarks are protected First Amendment speech.

A.  Only speech "likely" to produce "imminent" lawless action is "incitement," unprotected by the First Amendment.

Not all speech qualifying as "incitement" – defined by *Brandenburg* as the "advocacy of the use of force or of law violation," 395 U.S. at 447 – falls outside the First Amendment. Rather, only advocacy "[1] directed to inciting or producing imminent lawless action and [2] likely to incite or produce such action" is not protected by the Constitution. *Id.* (emphases added). The Constitution entitles an advocate to "stimulate his audience with spontaneous and emotion appeals for unity and action in a common cause." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982). *See also United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (noting that the First Amendment even "protects speech tending to 'encourage' or 'promote' a riot").

10

The Constitution does not, however, protect words that "provoke immediate violence," or "create an immediate panic." *Id.* at 927.

Incitement works through persuasion – the speaker's goal is to convince listeners to adopt his ideas and act as he directs. So long as "such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the 'profound national commitment' that 'debate on public issues should be uninhibited, robust, and wide-open.'" *NAACP*, 458 U.S. at 929 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also Myers*, 461 U.S. at 145 (1983).

Mr. Gunn's remarks meet neither prong: they were not likely to produce imminent lawless action. Urging people to "storm" the prosecutor's office with protests, telephone calls, and petitions was lawful. These comments were not likely to produce imminent *lawless* action, and did not produce any lawless action. They produced no action: not even the government was aware of the video for months.

B.  Only "true treats" are threats outside the protections of the First Amendment

Threats of "violence are outside the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). But it is not even "enough to show the use of language that is literally threatening." *United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997). Instead, "the government must show a 'true threat,' one that "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *Id.* (citing *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.

11

1976)). *Accord Black*, 538 U.S. at 359 (First Amendment only "permits a State to ban a 'true threat.'").

If the statement "meets this test, it is no longer protected speech because it is so intertwined with violent action that it has essentially become conduct rather than speech." *United States v. Francis*, 164 F.3d 120, 123 (2d Cir. 1999). *See also United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (A communication constitutes a true threat if "an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury.") (internal citation omitted). Laws barring such communications do not violate the Constitution, because they "protect individuals from the fear of violence and from the disruption that fear engenders." *Black*, 538 U.S. at 360 (cleaned up).

A "threat," is "a communicated intent to inflict harm or loss on another.'" *Elonis v. United States*, 575 U.S. 723, 733 (2015) (quoting Black's Law Dictionary 1519). It does its works by creating fear or arousing anxiety in the target. *Black*, 538 U.S. at 360 (noting the target's "fear of violence and [ ] the disruption that fear engenders" when she learns of the threat); *accord United States v. Howell*, 719 F.2d 1258, 1260-61 (5th Cir. 1983) (statement is a "threat" because, "[f]ar from attempting to influence others, Howell was merely stating his own unambiguous and apparently quite serious intention to take the life of the President"); *United States v. White*, 670 F.3d 498, 513 (4th Cir. 2012) (statement in which the speaker "call[s] on others to kill" the target is not a threat, unless the speaker "had some control over those other persons or [the

12

speaker's] violent commands in the past had predictably been carried out"); *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (describing "threat" as a communication that "create[s] apprehension that its originator will act according to its tenor") (emphasis added).

In most cases, "the threatening speech was targeted against specific individuals or was communicated directly to the subject of the threat." *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008). In other words, "while advocating violence is protected, threatening a person is not." *Planned Parenthood v. ACLA*, 290 F.3d 1058, 1072 (9th Cir. 2002) (en banc). *See e.g.*, *Kelner*, 534 F.2d at 1026 (explaining in threat prosecution that "[h]ere the crime charged is not that appellant was inciting others to assassinate Arafat but that he himself was threatening to do so"); *see also New York v. Operation Rescue*, 273 F.3d 184, 196 (2d Cir. 2001) (criticizing district court's "willingness to characterize a broad range of [ ] statements as 'threats' without giving them the full analysis required by the First Amendment" and without "determining whether a statement qualifies as a threat").

Here, Mr. Gunn simply did not threaten to physically injure the prosecutors. The lead up to the charged comments is calm, rather than threatening. Before the charged comments a slow R. Kelly song plays, and Mr. Gunn speaking languidly, with frequent pauses. Additionally, saying that he would "storm" the prosecutors was too vague to be a threat, no less a true threat. The verb "storm" is not inherently threatening. On the contrary, "to storm" has a number of meanings that have nothing

to do with physical injury. For example, it can mean to move "impetuously" or "angrily," as in the "crowd stormed through the streets." *See* Merriam-Webster.com, https://tinyurl.com/4kfunwf6. Or to express a strong or dramatic emotional response, as in "'Get out and never come back!' He stormed." *See* Cambridge Dictionary, https://dictionary. cambridge.org/us/dictionary/english/storm. It can mean "To rush with the violence of a storm," or to "complain with rough and violent language; to rage." *See* Oxford English Dictionary Online, https://www.oed.com/view/Entry/190961?rskey=rEY0I1&result=2&isAdvanced=false#eid. It can also mean an emotional reaction by a group, e.g., "There was a storm of protest when the next tax was announced." *See* Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/storm.

In context, it was clear that Mr. Gunn wished his listeners to "storm" the prosecutors' offices with protests and calls; to show the emotional reaction of the group, to influence the office with a storm of protest. This is because, right after the charged comments, he immediately started talking about protests, mirroring the same language, saying "If you don't got the stomach for this, bail out. Everybody that can't make it to the protests in the future, I would like you to call this number." 12:39.

Additionally, the clip from Boyz in the Hood did not convert Mr. Gunn's comments into a true threat. The movie clip shows four people driving in a car, one who has a gun, one who has a pacifier in his mouth, and a third person who asks to be "let out." The car stops, one person is let out, and the clip ends with him walking

14

on the street. Nothing violent occurs during the movie clip and, especially in context, it is not threatening. Directly before the movie clip, Mr. Gunn says if you do not have the "stomach" for what he was proposing, to "bail out." Directly after the movie clip, he repeats that phrase, saying that "a lot of our protests in the future will be held right outside of" the USAO's office, adding again "if you don't got the stomach for this, bail out."

No "ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *Turner*, 720 F.3d at 420 (2d Cir 2013). This conclusion is especially true as the government – the same office that is the alleged victim of the communication – did not "receive" this communication until many months after it was made. No ordinary, reasonable person would interpret a nine-month old remark that they would be "stormed" as a threat, when absolutely nothing had happened since the comment was made suggesting that it was.

Because Mr. Gunn's remarks were protected First Amendment speech, the indictment against him must be dismissed.

15

**Point II**

**The case should also be dismissed because the charged conduct does not meet the statutory elements as it fails to allege that Mr. Gunn had the required mental state and saying that "we're going to storm" people is not a "threat to injure."**

The charged conduct also does not meet the elements of the statute as a matter of law for two reasons. <u>First</u>, the statute Mr. Gunn is charged with violating, 18 U.S.C. § 875(c), requires that the government prove that the speaker had a mental state such that he knew that the communication would be viewed as a threat. *See Elonis v. United States*, 575 U.S. 723, 740 (2015) ("The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error."). As the Supreme Court described it, "wrongdoing must be conscious to be criminal." *Id.* 575 U.S. at 740 (citation omitted); *see also id* ("the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."). *Accord United States v. McCain*, 2023 WL 2335332, at *5 (2d Cir. Mar. 3, 2023) (noting that "the Supreme Court articulated a subjective element: a defendant must also have transmitted the communication 'for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat'") (citing *Elonis*).[5]

---

[5] *Elonis* did not decide what level of intent is enough and whether a reckless state of mind would be sufficient. 575 U.S. at 470. The Supreme Court may answer this question in a pending case,

16

Here, there is no evidence that Mr. Gunn intended to threaten the prosecutors: he did not send them his video, but only posted it publicly; the video was not directed to their attention at all and there is no indication the prosecutors saw it at any time close to the time it was posted; he did not take any action after making it that indicated he intended to harm them. Instead, Mr. Gunn did nothing to the prosecutors or their office in New York in the nine months between posting the video and being arrested in Illinois. On the contrary, the evidence shows that Mr. Gunn intended to rally people to protest how the R. Kelly case was being prosecuted, by picketing, calling the office, and signing petitions.

Second, section 875 (c) criminalizes threats to "injure the person of another." The charged remarks, however, did not threaten to injure anyone. Even divorced from the context that explains the goal of protesting, the vague remark that "we're going to storm" people is not a threat to injure someone. A review of successful prosecutions in the Second Circuit under Section 875(c) illustrates how different Mr. Gunn's remarks are from those that are threats to injure someone. These cases all involve language that unequivocally threatens physical harm, such as "I will kill" you. *E.g., McCain*, 2023 WL 2335332, at *5 (upholding Section 875(c) conviction based, *inter alia*, on text messages to victim stating: "i play with guns," "i will blow your fucking head off": "I will kill your daughter"" "i hit you where it hurts"); *United States*

---

*Counterman v. Colorado*, Dk No. 22-138 (argument scheduled for April 19, 2023).

17

*v. Smith*, 2023 WL 1126789, at *1 (2d Cir. Jan. 31, 2023) (guilty plea when person, *inter alia*, called prosecutor and said: "I just want to tell you, you are about to die ... that little girl in the background [Doe's five-year-old daughter] is going to watch you die."); *United States v. Vaughan*, 2022 WL 4361108, at *1 (2d Cir. Sept. 21, 2022) (guilty plea to 875(c) based on messages sent to "high school classmates threatening a school shooting"); *United States v. Jordan*, 639 F. App'x 768, 770 (2d Cir. 2016) (threats included telling "the victim via telephone that he would kill her and 'take her off the planet'"); *United States v. Choudhry*, 649 F. App'x 60, 63 (2d Cir. 2016) ("I'm going to kill their whole family.... I will keep shooting at them... I will kill myself and also make sure I kill all of them," "If you don't come back, I will kill each and every one of them. I will go to jail," and explained, "we had to threaten them...to have them bring you back."); *United States v. Berndt*, 127 F.3d 251, 253 (2d Cir. 1997) (guilty plea to Section 875(c) when person "threatened to rape and kill" ex-girlfriend, including saying that he would "come and [ ] kill her").

The district court cases in our circuit relating to Section 875(c) are similar: the language used by the defendant unambiguously threatened physical harm. *E.g., United States v. Wallace*, No. 2022 WL 3141759, at *1 (N.D.N.Y. May 31, 2022) ("voice message wherein she threatened to shoot him in the head, kill him, and rape him"); *United States v. Feeney*, No. 20-CR-541 (WFK), 2022 WL 580955, at *3 (E.D.N.Y. Feb. 25, 2022) (guilty plea to 875(c) based on voicemail advising "Individual #1 to tell John Doe to hire security because 'we know where every one of his family members live,'

18

and 'we will execute that n****r's family. They will be hunted down and f**king beaten to death.'"); *United States v. Telfair*, No. 19-CR-270, 2020 WL 550646, at *1 (E.D.N.Y. Feb. 3, 2020) (rejecting First Amendment motion to dismiss based on statements that person was "gonna die" and, "Fuck your kids, bitch. They can die too. Die, kids, die."); *United States v. Waldman*, No. 18-MJ-4701 (SN), 2018 WL 2932729, at *1 (S.D.N.Y. June 12, 2018) (hundreds of emails and texts sent to ex-partner, including saying that, "you are rare. and valuable. and something to be kept and cherished. and cherished can mean held hostage and bound and gagged inside my apartment."); *United States v. Mundle*, 2016 WL 1071035, at *2 (S.D.N.Y. Mar. 17, 2016) (person showed "his mother a gun [ ] in the waistband of his pants; threatened to kill his mother … [and] sister, [and mother's husband]"); *United States v. Li*, 537 F. Supp. 2d 431, 433 (N.D.N.Y. 2008) (repeated emails to people saying variations of "you will die"); *United States v. Veliz*, No. 03 CR. 1473 (GEL), 2004 WL 964005, at *1 (S.D.N.Y. May 5, 2004) (saying "they'll get [him] and cut [him] up" "because blabbers get killed."); *United States v. Francis*, 164 F.3d 120, 121 (2d Cir. 1999) (threats to "blow the victim's head off, cut the victim up into a thousand tiny pieces, slit the victim's throat, and kill the victim"); *United States v. Sovie*, 122 F.3d 122, 124 (2d Cir. 1997) ("I'm gonna kill you" and "I'll pound you right to fuckin' death").[6]

---

[6] Almost all of these cases also involved threats made directly to the victim; only three involved threats posted in a more public forum. Each of those cases still involved explicit threats of violence against someone. *United States v. Mara*, 2021 WL 8200597, at *1 (W.D.N.Y. Apr. 19, 2021) (facebook live post that said, *inter alia*, "They will act off impulse and they will try to kill us, when they do that. Then they will all die. We will kill them all. I will personally kill [Victim 1]." ); *United States v. Spear*,

Mr. Gunn's remarks simply were not threats to injure. He did not say he would kill someone, rape someone, cut someone up, or hurt anyone; he said nothing close to these types of explicitly threatening remarks. Accepting all of the government's facts as true, those facts are insufficient as a matter of law to convict Mr. Gunn and his charge, therefore, should be dismissed.

*      *      *

Whether the facts are insufficient as a matter of law to satisfy the elements of the charged crimes is a question that this court can and should answer. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969) (reversing jury conviction, finding lower court should have dismissed case as a matter of law because the "only offense here was 'a kind of very crude offensive method of stating a political opposition to the President'" that "[t]aken in context" was not a crime); *United States v. Stock*, 728 F.3d 287, 298 (3d Cir. 2013) ("we reaffirm that a court may properly dismiss an indictment as a matter of law if it concludes that no reasonable jury could find that the alleged communication constitutes a threat or a true threat"); *United States v. Alkhabaz*, 104 F.3d 1492, 1493 (6th Cir. 1997) (analyzing threats and affirming district court's conclusion as a "matter of law" that the "indictment failed" "to allege violations of Section 875(c)").

---

2021 WL 794784, at *1 (D. Vt. Mar. 2, 2021) (comment on YouTube post: "fuck you scum bag im going to set your family on fire and rape your dog" and "ill hunt you down and skin you alive u have 1 week before I kill you and your entire family"); *United States v. Jordan*, 2017 WL 9516819, at *1 (W.D.N.Y. July 14, 2017) (facebook post available to friends titled, "Let's Start Killin Police Lets See How Dey Like It").

## Conclusion

Because Mr. Gunn's remarks were protected First Amendment speech and they do not meet the elements of Section 875(c), this Court should dismiss the indictment against him.

Respectfully Submitted,

/s/
Allegra Glashausser
Assistant Federal Defenders
March 9, 2023

21